## Case No. 10,055.

### NATTERSTROM v. The HAZARD.

[Bee, 441;[1] 2 Hall, Law J. 359.]

District Court, D. Massachusetts. May 31, 1809.

SEAMEN'S WAGES—DEATH OF SEAMAN—SUIT BY LEGAL REPRESENTATIVES.

The law maritime will not sustain a suit for wages, by the legal representatives of a seaman beyond the time of his death, when the engagement was by the month.

John Taylor, on the 18th July, 1805, entered on board the ship Hazard [William Smith, late master] at Boston, as a mariner, for a voyage to the northwest coast of America, from thence to Canton, in China, and back to Boston, at the monthly wages of sixteen dollars, and signed articles in common form. The ship, soon afterwards, sailed on the proposed voyage, and on the 17th day of October, 1805, Taylor, with three other seamen, while manoeuvering the ship, in a gale of wind, were carried overboard by a sea, and drowned. The ship performed the contemplated voyage in safety, and returned to Boston on the 23d June, 1808. It appears that Taylor received thirty-two dollars advance wages, before the ship sailed from Boston, and that disbursements were made to him, on the voyage, by the master, to the amount of thirty-five dollars and fifty cents, exceeding, in the whole, the amount of wages, to the time of his death. The respondents [James and Thomas H. Perkins] allege, and it is not denied by the libellant, that by reason of the death of said Taylor, and of the three other seamen, who perished with him, the master of the ship was obliged to proceed to Rio Janeiro, where he arrived on the 11th November, 1805, there to hire four other seamen, which he accomplished at high and extravagant wages, to replace those who were lost, and to enable him to prosecute the voyage aforesaid; and they further allege, "that it is and ever has been the usage, custom, and practice of the trade, in which said ship was employed, in the voyage aforesaid, for the owner or master of the ship or vessel to pay, and the legal representatives of any mariner belonging to a ship or vessel, who had signed articles of agreement or a shipping paper, and happened to die on the voyage, to receive the wages accruing to such mariner, from the time of his entering on board such ship until his death, at the rate expressed in such articles or shipping paper, in full satisfaction of all claims and demands of such representative against the owner or master of said ship or vessel, for the wages or services of such deceased mariner."

This cause has been amply discussed, and it remains to determine the only question on which it depends; what is the legal effect and operation of the death of the mariner, Taylor, in manner and at the time above

[1] [Reported by Hon. Thomas Bee, District Judge.]

stated, on his wages? For the libellant it is contended, that the same amount is by law due, as if he had survived and continued in the service of the ship, during the whole voyage. On the other hand, it is contended for the respondents, that his wages, at the stipulated rate, are only to be reckoned to the time of his decease; and, of course, that the libel ought to be dismissed, as more than the amount of wages, due on that principle of computation, had been paid to the deceased.

The counsel for the libellant rests his claim on the seventh article of the Laws of Oleron, the nineteenth of Wisbuy, and the forty-fifth of the Hanse Towns; and on a late decision in the circuit court of Pennsylvania,—Sims v. Jackson [Case No. 12,890],—affirming a decree of the district judge, by which full wages, for the whole voyage, were given to the legal representative of a seaman who had engaged for a voyage from Philadelphia to Batavia, and back, and who died, in the course of the voyage, at Batavia.

DAVIS, District Judge. In the examination of this subject, I shall first inquire into the genuine meaning and import of the ancient ordinances above mentioned, in reference to the point under consideration. We have, I presume, a correct text of the Laws of Oleron, in the Us et Coustumes de la Mer, by Cleirac. The seventh article prescribes the duties of the master, when a mariner falls sick, in the service of the ship. It directs, that he shall be put on shore, and that suitable humane provision shall be made for him. The closing paragraph, which, alone, has special application to the question now under consideration, runs thus: "Et si la nef estoit preste à s'en partir, elle ne doit point demeurer pour luy; et s'il guarit, il doit avoir son loyer tout comptant, en rabatant les frais, si le maistre luy en a fait; et s'il meurt, sa femme et ses prochains le doivent avoir pour luy." "And if the vessel be ready for her departure, she ought not to stay for the said sick party; but if he recover, he ought to have his full wages, deducting only such charges as the master has been at for him. And if he dies, his wife or next of kin shall have it." I resort to the same author for the correspondent articles in the other ordinances, not having been able to find any copy of the original text.

### Ordinances of Wisbuy, Art. 19.

| | |
|---|---|
| Si le matelot tombe en infirmité de maladie, et qu'il convient le porter à terre, il y sera nourri comme il estoit dans le bord, garde et servy par un valet, et s'il vient en convalescence, sera payé de ses gages; et s'il decède, ses gages et loyers seront payez à sa velue, ou à ses heretiers. | If a seaman falls ill of any disease, and 'tis convenient to put him ashore, he shall be fed as he was aboard, and have somebody to look after him there; and when he is recovered, be paid his wages; and if he dies, his wages shall be paid to his widow or heirs. |

### Laws of the Hanse Towns, Art. 45.

| | |
|---|---|
| Que s'il revient en convalescence, il sera payé de ses gages tout ainsi comme s'il avoit servy, et s'il meurt, ses heretiers les retireront entierement. | If he recovers his health, he shall be paid his wages, as much as if he had served out THE WHOLE VOYAGE; and in case he dies his heirs shall have what was due to him. |

I adopt the translation given in the "Sea Laws," first published in England, in the reign of Queen Anne, not from a respect to the translation of those ordinances, in general, as contained in that work, for in several instances it is palpably incorrect, but because, from its long standing in our language, it is entitled to consideration, and in the articles now cited, it gives, to my apprehension, the sense of the text, with sufficient correctness. Stress has been laid, by the respondents' counsel, on a supposed mistranslation of the article from the Laws of Oleron. It is said that the word "comptant" means "money down," and, that the addition of the word "tout," to the word "comptant," only renders the expression more emphatic. However this may be in modern French, and there are certainly respectable authorities in support of the criticism, I am convinced, that something more was intended by the phrase, as used in the article cited, and that it was designed to express not merely the mode of payment, but has reference to the quantum. It is evident from Cleirac's comment, that he so understood it; and I consider the meaning to be the same, as is conveyed by the word "entierement," which he uses in translating the cited article of the Laws of the Hanse Towns. Valin, in his discussions relative to wages, frequently uses the phrases "en entier" and "en plein," which are of equivalent import. But these modes of expression do not, necessarily and universally, imply an absolute payment of the wages for the whole voyage. Such, indeed, is their frequent application; but we also find expressions of this description employed, when a payment of wages, for a less time than the whole voyage, is most evidently intended.

The third article of the Laws of Wisbuy directs, that if a master discharge a seaman without just cause, after the commencement of the voyage, he shall pay him "entierement, tous les gages promis." This passage, in the Sea Laws, is rendered "all his wages as much as if he had performed the voyage." This is a free translation, but it gives the sense of the original; and the regulation corresponds with the principle of the eighteenth article of the Laws of Oleron, by which an offending seaman, if tendering amends, is to be retained, and if discharged after such offer, is entitled to full wages, as if he had continued in the ship. The expression there is "aussi bon loyer comme s'il estoit venu audedans"—"as good hire as if he had come in the ship," equivalent to "entierement, tous les gages promis," In the third article of the laws of Wisbuy, and to "tous leurs loyers," in the twentieth article of the Laws of Oleron, applied to a contract by the run, when the voyage is abridged by the act of the owner or the master, in proceeding, with the ship, to some port nearer to the place of departure and destined return, than was stipulated in the contract. Other instances might be cited, where this meaning must be understood, but

there are also many, in which expressions of this description must have a more restrained construction. Valin, in commenting on a royal ordinance of France, framed to determine a question relative to ships ordered to a certain station, and there to wait for convoy, recites it in the following terms: "La solde des gens des équipages seroit payée en plein du jour que les navires auroient mis à la voile, jusqu'au jour qu'ils auroient mouillé dans la rade du convoi; que depuis qu'ils auroient mouillé jusqu'au jour de la flotte, ils n'auroient que la demi-solde, et qu'apres le depart, la solde leur seroit continué en entier, pour le reste du voyage"—"The wages of the crew shall be paid in full from the day of the vessels' sailing to the day of their mooring in the road of the convoy; from the time of their joining the convoy to the departure of the fleet, they shall have only half wages, and after the departure, their wages shall continue in full for the remainder of the voyage." It is here apparent that the phrases "en plein" and "en entier," apply to the rate of wages, and that for the portions of the voyage specified, they shall be without deduction. A similar use of this expression we find, relative to another ordinance, that of 17th October, 1748, respecting vessels waiting for convoy in the colonies. Speaking of the crew, he says: "Seront payés de leur salaries en entier, pendant le sejour que lesdits navires auront fait dans les desdites isles, jusqu'à concurrence du terme de six mois, et seulement de la moitié pour le temps excédent ledit terme"—"They shall be paid their hire in full while said vessels shall remain at the aforesaid islands, for the term of six months, and half wages, only, for the time exceeding said term." Volume 2, 698. The eleventh article of the ordinance of Louis XIV. relative to seamen's wages runs thus: "Le matelot qui sera blessé au service du navire, ou qui tombera malade pendant le voyage, sera payé de ses loyers et pansé aux depens du navire"—"A seaman who shall be wounded in the service of the ship, or who may fall sick during the voyage, shall be paid his wages, and be cured at the expense of the ship." As it relates to the wages of the sick seaman, this corresponds with the seventh article of the Laws of Oleron. The words "tout comptant," or terms equivalent, are not, indeed, inserted; but both Valin and Pothier understand the meaning to be the same as if it included such expressions. The latter writer, in commenting on this article, observes, "Le matelot tombé malade ou blessé au service du navire, gagne en entier son loyer, non seulement lorsqu'il est resté dans le navire, mais même, dans le cas auquel ayant été mis à terre, dans un port, où le navire a relâché, il y auroit été laissé s'étant trouvé hors d'état d'être rembarqué, lorsque le navire est reparti"—"The seaman who may become sick or wounded, in the service of the ship, is entitled to his wages in full not only while remaining on

board the ship, but also if he should be put on shore in a port where the ship may have stopped, and should be there left, on account of his being unable to return on board the ship, at the time of her departure." Louage des Matelots, § 2. It is here apparent that the phrase "en entier," which must be admitted to be equally forcible with the words "tout comptant," is applied, by this very accurate writer, to express nothing more, than that there shall be no deduction for sickness, or for absence from the ship, from that cause. It may be said, that the commentator, in giving this construction to the article, had in view a subsequent article, of the same ordinance, article 13, which directs, that the heirs of a seaman engaged by the month, and who may die during the voyage, shall be paid his wages to the day of his decease. But the eleventh article in general, and its provisions in favour of a sick seaman, apply not merely to those engaged by the month, but to those engaged on other terms. Further, it is evident, from Pothier's comment on the thirteenth article, that his conceptions of the dispositions made by the eleventh article, were formed on distinct grounds, and instead of having a prospective view to the thirteenth article, while discussing the eleventh, he founds the application of the thirteenth article, relative to heirs, on the provisions made by the eleventh article, relative to the sick seaman while alive. The heirs, he says, shall, of course, have the wages accruing during sickness, and the disposition of this article is but an exact consequence of article eleven. "La disposition de cet article n'est qu'une consequence exact de l'article 11me." Louage des Matelots, § 2. In this there is, to my apprehension, a perfect correspondence between Pothier and Valin. The latter writer, commenting on the thirteenth article, which relates wholly to what the heirs shall recover, commences his remarks by stating, what the deceased seaman had acquired. "Le matelot ayant gagné ses loyers jusqu'à son décès arrivé pendant le voyage, et cela, aussi bien durant le temps de la maladie que pendant celui qu'il a rendu un service effectif au navire, il est bien juste qu'ils passent à sa veuve et heretiers." "The seaman having earned his wages to the time of his death, happening, during the voyage, as well during his sickness, as for the time when he rendered actual service on board the ship, it is just that they should go to his widow and heirs." In this passage, Valin evidently has reference to the eleventh article. In his comment, on that article, he denominates the disposition which it makes relative to wages of a sick seaman, as a right to wages en plein; an expression which must be understood, as it is used by Pothier, in this connexion, to intend, merely, that there shall be no diminution of wages on account of sickness.

It is to be understood, that I do not consider the dispositions made by the articles of this ordinance, as an authoritative settlement of the question; though they are most explicit in their terms. I only resort to them and to the commentators above mentioned, with a view to a right understanding of the phraseology employed in the articles of the Laws of Oleron, Wisbuy, and the Hanse Towns, all of which are given in the French language by Cleirac, and from whose work the received English translation appears to have been made. From this examination, I am satisfied, that the terms "tout comptant," "en entier," or "entierement," as applied to wages, do not, necessarily, mean wages for the whole voyage; that they admit of a different and more limited application, according to circumstances, and that the true meaning, in the respective instances, in which they are employed, must be determined from the subject matter and the connexion. "Noscitur ex sociis." I may further add, that it is not unfrequent, where the meaning might be otherwise equivocal, to add expressions, which render the sense perfectly certain, such as "comme s'il avoit servi tout le voyage," or the like. Applying these views of the language of the law, which we are considering, to the seventh article of the Laws of Oleron, and to the correspondent articles in the Laws of Wisbuy and of the Hanse Towns, I cannot find, that those articles either express or intend that the heirs of a seaman dying in the course of the voyage, shall recover wages in his right, as if he had lived and served out the voyage. The object of all those articles is to make suitable dispositions relative to seamen falling sick on a voyage. They direct how they shall be treated, and what shall be the results as respects their wages, in case of recovery, or of death. The expression, "tout comptant," in my apprehension, means nothing more, than that there shall be no deduction on account of sickness, either as against the seaman himself, if he recover and claim his wages, or against his heirs in case of his decease. Two interesting points were established by these articles, both wisely and humanely calculated to sooth the sorrows of the sick, or disabled mariner; that his calamity, if not produced by his own criminality or fault, should not diminish his stipulated wages, during the existence of his disability, or his necessary absence from the service of the ship from that cause; and, that in case of his death, all that was due to him should descend to his heirs. Both these provisions seem so perfectly reasonable, that, it may at first view appear, that a formal article could hardly be necessary to enforce them, and we may, on this ground, be induced to apprehend that something more was intended. But the first point is, even now, occasionally questioned by ship owners and masters, and, we may easily satisfy ourselves, that, it then appeared necessary that both should be declared. The application of the Roman law de locatione et conductione, to which Pothier expressly refers, for a construction of the contract of hiring of labour, in general, and for

the hire of seamen, in particular, would exclude a claim for compensation during the disability of the servant or labourer. But, as generous masters, says this esteemed commentator, will not insist on a strict enforcement of their rights, but continue the compensation of a sick servant, notwithstanding his disability to perform his stipulated services, so the law marine in relation to mariners converts into an obligation what, in other instances of hire, is the result of benevolence. The object of the law, he adds, is, for the encouragement of seamen, and as a compensation for the risk which they run of an entire loss of wages, from inevitable accidents occurring to the ship, or from a destruction of the voyage. Louage des Matelots.

Doubts derived from the rules of law relative to entirety of contracts, and perhaps also some principles of the law de societate, might have rendered necessary the express declaration, in favour of heirs, that is made by the articles under consideration. A similar provision was made by the Consolato del Mare, and we learn from Cleirac, that it was the express object of an ancient ordinance of France, to declare such right of succession in favour of the heirs of mariners, dying on the voyage. "Si le marinier meurt à voyage, les ordonances de France conservent ses biens à ses heretiers en termes generaux, sans parler precisement, comme fait ce jügement, des loyers ou gages meritez ou à meriter." "If a mariner die on the voyage, the ordinances of France preserve his property to his heirs, in general terms, without specifying, as this article does, wages earned or to be earned." Cleir. 34, on article 7 of Laws of Oleron. It is not necessary, therefore, in order to satisfy the expressions in the Laws of Oleron, and in the other ancient marine codes, to consider them, as giving to heirs of a mariner, dying on the voyage, the same amount of wages, as the deceased would have received, if he had lived until the termination of the voyage. I admit, indeed, that the phrase "tout comptant," in the Laws of Oleron, is to be understood to apply to the heirs as well as to the seaman, as the word "entierement" is, in the Laws of the Hanse Towns, and, that these terms are well enough rendered by the expression "full wages." Still it remains to be determined, what is the precise import of these expressions, used in this connexion.

The apparent or plausible ground, on which a diminution of wages may be claimed, by a master, against a seaman, being, in any case, suggested, will enable us to determine in what sense, the words "en entier" or "entierement" are to be understood. When a seaman is discharged without good cause, no question could occur to any reasonable mind, relative to his earnings to the time of his discharge. Whatever doubt might arise, in regard to his claim for wages, would respect the remainder of the voyage, from which he was wrongfully expelled. In such a case, therefore, we must understand the term "entierement," in the

third article of the Laws of Wisbuy, to intend wages for the whole voyage. But in the cases supposed by the seventh article of the Laws of Oleron, the only ground, which could be suggested for a subtraction of wages, is the sickness and disability of the mariner; and when it is said, he shall, notwithstanding, receive his wages tout comptant, it is apparent, that nothing more is intended, than that no deduction shall be made on that account. An application of this construction to the different cases that might occur will test its solidity. 1st. With regard to the seaman himself. If he recover, says the law, he is to have his wages tout comptant. If, after such recovery, he join the ship, before the completion of the voyage, his right to wages tout comptant, or to full wages, must, in such a case, evidently mean, that no diminution shall be required on account of his non-performance of duty or absence from the ship by reason of sickness. His claim to wages, for the residue of the voyage, will depend on future services and circumstances, and not on the provisions made by the law relative to the operation of his sickness. A like construction of the article must, I apprehend, be given, if a seaman, who may be left abroad sick, should recover and return home before the arrival of the ship, and the ship should afterward arrive in safety. If the sickness be supposed to be of such continuance, that he be not able to return to the ship during the voyage, but he survives the prosperous termination of the voyage and returns home after the arrival of the vessel; he shall in like manner, by the articles cited, have wages tout comptant or entierement, or full wages. The wages in this case, would, indeed, be for the whole voyage; but the force and meaning of those operative expressions are the same as before. He shall receive wages for the whole voyage, not because tout comptant, entierement, or full wages, necessarily and exclusively mean wages for the whole voyage; but because, as in the other case, they protect him from a deduction from his wages on account of sickness, and the sickness or disability, which entitled him to indulgence, is supposed to have continued until the termination of the voyage. 2d. In regard to the heirs of such deceased seaman. I understand the same expressions, by fair implication, to extend to them, but in the same sense. If the sick seaman survive the prosperous termination of the voyage, and afterward die, without having recovered his wages, his heirs shall recover them entierement, or tout comptant. But, in this case, the same remarks are applicable, which have been suggested relative to a demand for wages by the seaman himself, after such conclusion of the voyage; and, for the same reason, the meaning of the terms "entierement" or "tout comptant," remains, in this case, equally unchanged. The right to wages, in such a case, for the whole voyage, results not from the mere force of those terms, but from this concur-

rent, essential fact, the continuance of the disability or absence from that cause, commensurate with the voyage.

The death of the seaman, before the termination of the voyage, presents a case involving the very point in question. In such case, also, the heirs shall receive the wages entierement or tout comptant. But we ought to understand those terms, in the same sense as they are evidently to be understood, in the preceding cases. If we construe them as giving to the heirs the wages, for the residue of the voyage, we, in fact, change their meaning, or include an idea not implied in those terms, in the other cases supposed. This would appear to me an inadmissible mode of construction, as the subject matter, to which the terms are applicable, is unchanged. In the case of a seaman wrongfully dismissed from a ship, his connexion with the ship is dissolved by the mere injurious act of the master. This act gives to the seaman an immediate right to wages for the whole voyage, subject, indeed to contingencies which may defeat the voyage, and of course his claim. But the object of the provisions relative to disability was not to give a new right to the seaman, in consequence of his falling sick, but to protect him from loss. I am satisfied, therefore, that the expressions referred to, must, in case of death during the voyage, be understood in the same sense as in the other cases, and that they mean nothing more than a security against any diminution of the wages, on account of sickness. In this manner, it appears to me, these articles were understood by the commentators; and I find no intimation, either in Cleirac or Valin, that they considered the heirs entitled to wages by these articles, beyond the death of the seaman, whom they might represent. Cleirac, under the seventh article of the Laws of Oleron, mentions the ordinances of Charles V. giving to the widow or heirs of a seaman, dying on the outward voyage, one half the wages agreed for, and, if dying on the homeward voyage, the whole wages. He remarks the correspondence of this provision with the dispositions made by the Consolato del Mare, which also provides, that the heirs of a seaman, who was engaged by the month, shall be paid according to the time that he may have served. He then proceeds to notice a more favourable provision for widows and heirs of deceased seamen in ships of war, on long voyages; that, if a man should die, on the first day after the commencement of the voyage, his heirs should be paid for the whole voyage. "Ses heretiers seront payés pour tout le long du voyage." If Cleirac intended to compare this generous provision with the disposition made by the Laws of Oleron, he could not denominate it, more favourable, on the construction contended for by the libellant's counsel in this case; for, on such construction, the provision by the seventh article of those laws, would be, in fact, the same as is noted by Cleirac,

to have been observed on board ships of war. But if he is to be understood as making a comparison with the regulations of Charles V. and of the Consolato del Mare, previously mentioned in his note, it would still appear unaccountable, why this instance of such generous provision should be alone selected, and that he should be silent as to a like disposition, made by the very article on which he was commenting, according to the construction contended for by the counsel for the libellant. The strongest aspect in Cleirac, in another direction, is in the expression, "loyers ou gages meritéz ou à meriter," in the note above quoted. But I understand the word "meritéz" to refer to the wages earned while the mariner was performing service, and "à meriter," not to have reference to any supposed accruing of wages after death, but to those earned or considered as earned during sickness and disability, or absence from the ship from such causes. Valin, it is well known, is copious and minute; and abounds in references to the Laws of Oleron, Wisbuy, and the Hanse Towns, and to Cleirac's commentary. I cannot find, in his ample and very valuable work, any recognition of the doctrine, that by the Laws of Oleron, Wisbuy, or the Hanse Towns, the heirs of seamen dying on the voyage, should recover wages, as if such seaman had served out the voyage. The fifteenth article of the ordinance of Louis XIV. provides, that the wages of a seaman, killed in defending a ship shall be paid in full as if he had served the whole voyage, provided the ship arrive in safety. We should expect the commentator, under this article, to remark its correspondence with the Laws of Oleron, Wisbuy, and the Hanse Towns, relative to seamen dying from any other cause, if, in his opinion, those laws were to be thus understood. On such extended construction, also, of the seventh article of the Laws of Oleron, we should expect the commentator to notice its repugnancy to the eleventh article of the ordinance of Louis XIV. We find no such intimation; but from a careful inspection of his comments, particularly on articles 11, 13, and 14, I am satisfied, that this able writer did not understand the Laws of Oleron, Wisbuy and the Hanse Towns, as giving a claim to wages beyond the death of the mariner. It should be observed also, that if the seventh article of the Laws of Oleron, did, in true or received construction, give full wages for the whole voyage, in all cases of death on the voyage, without fault on the part of the mariner, there could be no necessity, as those laws constituted a portion of the marine law of France, to make the special and exclusive provision of that nature, for a seaman killed in defending the ship, as is done by the fifteenth article of the ordinance of Louis XIV.

It is material in the next place to inquire, how these ancient marine codes have been generally understood in the countries origi-

nating them. I can find no evidence, that they have, in any European country, been applied in the sense contended for, in this case. in support of the libellant's claim. It is well observed by Valin, that next to equity in a law, are its perspicuity and brevity. The seventh article of the Laws of Oleron and the correspondent articles in the other ordinances, are sufficiently brief. They are not remarkable for perspicuity, and on the construction contended for, in support of the present claim, would not be equitable. There would result one fixed, invariable rule, in case of the death of the seaman, during the voyage, whatever might be the nature of the engagement, whether by the month, for the voyage, part-profit, or freight. If there had been no other resource, some tolerable system might, by a course of decisions, have been founded on the basis of this article, relative to the cases of death of mariners during the voyage; but it does not appear that the law upon this subject has been extracted from this source, excepting so far as relates to the operation on wages of sickness, and disability of a seaman. The fact is, that exact and definite provisions, reasonably accommodated to the necessary diversity of occurrences, had before been established by an excellent and venerable code, originating among a very intelligent and highly commercial people. I refer to the Consolato del Mare; the 127th article of which expressly provides, that the heirs of a seaman, engaged by the month, and dying on the voyage, shall be paid his wages for the time of his service. "Se il marinaro è accordato a mesi, et morirà, sia pagato, et dato alli suoi heredi per quello, che havessi servito." The preceding article directs, that if the engagement be by the voyage, half or the whole shall be received by the heirs according to the period of the voyage, in which the death should occur.[2] These articles of the Consolato are quoted by Cleirac: and from the manner in which Valin refers to them, and to Cleirac's quotation, I understand him to mean, that they constituted a portion of the received marine law of France. on this subject. I have no means of information, of the application of the

[2] There is a diversity, in the different editions of this work, in the numbers of the chapters. The edition here quoted is that of Leyden; printed in 1704. In Cleirac's commentary, the chapter here referred to as the 127th, is quoted as the 130th. Valin cites it by double numbers. The Consolato del Mare contains precise regulations on several topics. not contained. or only incidentally mentioned. in the Laws of Oleron, of Wisbuy, or of the Hanse Towns. It is to be regretted that a work, so comprehensive and valuable, should be so rare. and it appears surprising that an English translation of this venerable code has never yet appeared. A French translation, with commentaries and dissertations of much promise. has recently been announced. Anthology. for February last. It may be hoped, that this example will be duly emulated. and that a long time will not elapse, before our Bibliotheca Legum shall present this valuable work, in our own language.

Laws of Wisbuy, in this particular, in the countries, where they may be supposed to have had special influence or authority. In determining on the application of the Laws of the Hanse Towns, it would have been satisfactory, to have consulted Kuricke's commentary on the revised code of those laws, of 1614. This work I have not been able to find; but in "the Ship and Sea Laws of Hamburg" as contained in Herman Langenbeck's treatise, published A. D. 1727, there appears to be an affirmance of the Laws of Oleron, as to the manner in which a seaman. falling sick on a voyage, shall be treated; and, if he dies on the outward passage, the heirs are to have half his wages and privilege, if on the return voyage, the whole; deducting the expenses of interment. In this principal city, therefore, of the Hanseatic confederacy, we find an express partial adoption of the provisions, made by the Consolato, on this subject, with this only difference. that the Hamburg law makes the same provision, whether the contract be for the month or for the voyage, which the Consolato distinguishes. It is observable, that we do not find, in Langenbeck's commentary, any intimation, that. by the Laws of the Hanse Towns, the heirs of a seaman, dying on the voyage, would be entitled to the whole sum, which such seaman would have earned, if he had lived to the end of the voyage. Such a disposition would have been materially different from that made by the thirtieth article of the Hamburg laws, on which he was commenting, and if such diversity, in true construction, really existed, we must suppose it would have been noticed. The Hamburg regulations disregard the distinction that is made by the Consolato del Mare, between an engagement by the month, or for the voyage, as respects the amount of wages to be paid, in case of death of a seaman during a voyage. The discrimination, made by the Consolato, is adopted by the ordinance of Louis XIV. and it is believed, was the previous maritime law of that country, by tacit adoption of that provision in the Consolato. Pothier suggests a reason for the distinction. The seaman. who is engaged by the month, does not sustain the risk of calms, contrary winds and other impediments, which may prolong the voyage; however protracted, if not interrupted, or broken, so as to defeat a claim for wages; they are commensurate with the length of the voyage. Whereas one engaged for the voyage, runs the risk of an inadequate compensation for his services, by an accidental protraction of the voyage, beyond the term contemplated as the measure of his reward, when the contract was made. On this ground, says Pothier, the ordinance proceeds, corresponding in this particular, with the Consolato del Mare, and, as a compensation for the different risks. is the distinction made. Louage des Matelots.

I proceed to inquire, how the law, on this subject, has been considered and received in

England; a question, for obvious reasons, of material importance. The rules and proceedings in maritime matters, in that country, became ours, by express adoption, in the first New England colony (Plymouth Colony Laws, 48); and the law on this subject, as understood and practised in that country, before our Revolution, may be considered as making a portion of our law, unless some other express provision, adverse decisions, or contrary received usages, either before or since the Revolution, should have effected an alteration. The foreign ordinances, on maritime affairs, have not the binding force or authority of law in England, not even the Laws of Oleron, to which that nation have long been, and still are, particularly partial. The extent of the adoption of any article of those laws, in that country, and the sense in which they are received, can only be learned from the decisions of their courts, and the approved treatises of their eminent juridical writers. To Godolphin's "View of the Admiral Jurisdiction" there is annexed an appendix containing a translation of the Laws of Oleron, with notes and observations. That part of the seventh article which is relied on in this case is thus rendered: "He ought to have his full wages or competent hire, rebating or deducting only such charges as the master hath been at for him, and, if he dies, his wife or next of kin to have it." To this is added the following note; "Executors of a deceased mariner ought to receive the wages due to him." I would here make the same remark as I have before suggested relative to the translation given in the "Sea Laws." I do not introduce the translation, inserted in that appendix, from a respect to its general correctness, for there are some palpable and some whimsical errors.[3] But the translation, given in the treatise, of the seventh article of the Laws of Oleron, with the note subjoined appears to me to evince, that this learned civilian did not receive the article in a sense, which would support the present claim. Molloy, in referring to the articles of the Laws of Oleron, copies the provisions relative

---

[3] A remark of this sort may seem to require verification. Two instances, only, will be mentioned in this place: Art. 14.—"Oster la toüaille trois fois," is understood, in this translation, to mean "three times lifting up the towel," and it is thus copied into Molloy. The true meaning, "a denial of the mess three times," is given in the Sea Laws and in other subsequent compilations. Art. 9—"Les mariniers doivent avoir un tonneau franc, et l'autre doit partir au ject." is thus translated. "The mariners, also, ought to have one tun free and another divided by cast of the dice." This rendering is followed in the Sea Laws, in Postlethwayt's Dictionary of Trade and Commerce, and in some later publications. It is evident from Cleirac's commentary, that the contribution to a jettison, intended here to be directed, is not to be decided by cast of the dice. The seamen are to have one ton free, and the remainder of their privilege is to contribute its proportion. The article, says the commentator, "ordonne pour les mariniers un tonneau franc en la contribution, et veut que la reste participe au jet."

to the seaman's right to wages, if he recover from his sickness, but altogether omits the provision respecting the heirs. He inserts the substance of that article of the Rhodian law, which subjects the master to the payment of a year's hire, to the heirs of a mariner, drowned in consequence of insufficient tackling. In both these instances, if it were part of the marine law, as received in that country, that in case of a seaman dying on the voyage, his heirs were entitled to recover wages as if he had lived and performed the voyage, it was certainly a strange and culpable omission not to insert or to intimate it, in an elaborate treatise "De Jure Maritimo." But my opinion, on this part of the subject, does not altogether rest on omissions of this sort. Later and more accurate English writers than Molloy are very clear and express on this point. Abbot considers the construction of the foreign ordinances as doubtful. In the English law books, he says, there is no general decision on the subject; but refers to a case (Cutter v. Powell, 6 Term R. 320), in which he says, it seems to have been admitted, that the representatives of a seaman, hired by the month, would be entitled to a proportion of wages to the time of the death. In a late respectable work, Abbot's statement is confirmed, by observations altogether similar. Com. Cont. 377. An inspection of authorities on this subject, as well as a respect for the accuracy of the writers of those digests, has satisfied me, that it is not, and never has been, the received law in England, either in the courts of common law or admiralty, that the heirs of a seaman, hired by the month, and who may have died in the course of a voyage, are entitled to recover wages, as if the mariner had lived and served out the voyage. In the case of Chandler v. Grieves, 2 H. Bl. 606, note, on the motion for a new trial, the court obtained a certificate from the admiralty, of the law marine, relative to the right of a disabled seaman to wages. It was certified, that according to the usage of the admiralty, a seaman disabled in the course of his duty, was holden to be entitled to wages for the whole voyage, though he had not performed the whole. The result was, that the rule was discharged. The amount actually recovered in the case, was not to the conclusion of the voyage, though it has been frequently so stated even by English writers; but, the rule being discharged, judgment must have been according to the verdict, which was only for wages to the time of the ship's departure from Philadelphia, where the disabled seaman was left. It is admitted, however, that the principle, certified from the admiralty, and on which, it may be presumed, the court of common pleas proceeded in discharging the rule to shew cause, would authorise and require a recovery of wages, under the circumstances of that case, for the whole voyage; and such I have observed to be the just construction of the Laws of Ole-

ron and the other foreign ordinances. But we have no opinion from the admiralty, nor in the common law authorities, that wages are recoverable, after the death of a seaman, for the subsequent portion of the voyage; and it is observable, that such a position is not found to be maintained in argument, though, if correct, it would certainly, forcibly apply in several cases reported in the books. "In the case of a mariner's dying in the course of the voyage" says a learned judge of the court of common pleas, "it should seem that he is entitled to a proportionate part of his wages, unless he be excluded by the specific terms of his contract." Justice Heath, Beale v. Thompson, 3 Bos. & P. 425. An observation of this sort, from a learned judge of the court, and the dubious, qualified language of Abbot and Comyns, that a pro rata recovery of wages seems to be admitted in case of a death of a seaman on the voyage, who was hired by the month, indicate their views on this subject, and are inconsistent with the supposition that they considered the law as giving wages for the whole voyage in such case, or that such is the received law in England, on that subject. In our own country, the law and usage appear to have been the same; in Massachusetts I may say, uniformly so. We find, indeed, no decision. A demand of this description does not appear to have been made in legal shape, until since the late decision in Pennsylvania. The libellants' counsel was apprised, that the court would hear evidence, of any usage in support of this claim. None has been offered, and it was frankly admitted, that the contrary usage had prevailed, with the exception above expressed.

The uniform usage, as alleged by the respondents, is satisfactorily maintained. To introduce a different rule, would, in my opinion, be to give a construction of the contract, not contemplated by either of the contracting parties, and not consonant to the law, on the subject, at the time when the contract was made. I perceive, in the report of the case determined in Pennsylvania, it is intimated, that the extreme severity on ship owners, of the operation of the decisions in the district court, has produced a general practice of inserting a covenant in the shipping articles, that wages shall cease on the death of a seaman. The introduction of such provisions may be attended with difficulties, among a class of men, frequently uninstructed, attached to old forms and habits, and who may be jealous of an express stipulation, though, in reality, altogether consonant to a tacit construction, by which they had ever been governed. It would be injurious to require it, unless absolutely necessary. From my view of the law on this question, it does not appear to be requisite, unless it be to avoid controversy, on a subject, on which there is a diversity of sentiment. I regret this collision with opinions which I highly respect. It

was incumbent on me, under such circumstances, to weigh, with great deliberation, the grounds of a different persuasion; but such being my opinion, after thorough examination, I consider it a duty to declare it. I ought here to suggest the relief afforded to my mind, in regard to difficulties of this description, by an interlocutory opinion expressed by the Hon. Judge Cushing, at the last circuit court in this district, in the case of Oystead v. The Perseverance [unreported], and by the consideration, that the decision now given, if erroneous, may be revised and corrected in a higher tribunal.

The examination which I have made of this subject, has led me to an affirmative conclusion on the following points. 1st. That, by general principles of law, on a contract of hire, no compensation can be claimed beyond the death of the party hired. 2d. That the Laws of Oleron, of Wisbuy, or of the Hanse Towns, do not provide, that, in case of the death of a seaman on a voyage, wages are recoverable beyond the time of his death. 3d. That the intent of those ancient ordinances, in the articles relied on in this case, was to determine the effect and operation of sickness or disability, incurred in the service of the ship, during the voyage, and to provide for payment of wages, without deduction on that account, either to the seaman, if he recover his health, or to his heirs, in case of his death. 4th. That it does not appear, that those ordinances have, in those countries where they are peculiarly authoritative, been used and applied as entitling the heirs to wages, for any time subsequent to the death of a seaman. 5th. That approved commentators, such as Cleirac and Vaiin, do not establish the construction contended for in support of this claim. 6th. That the Consolato del Mare, a work of approved authority, in case of an engagement by the month, and death on the voyage, expressly limits the wages to be recovered by heirs, to the time of the death of the mariner. 7th. That the law marine has not been otherwise understood and received in England, but in regard to an engagement by the month, and death on the voyage appears to be consonant to the Consolato del Mare. 8th. That in Massachusetts, the usage has uniformly been to make payment of wages, in such case, only to the time of the death of the seaman, and the law has been considered as consonant to the practice.

On these considerations, it is my opinion, that the law maritime, which I am to administer, will not sustain a claim for wages, by the legal representatives of a seaman, beyond the time of his death, when the engagement was by the month. In the present case, advances were made exceeding the amount of wages, due at the time of the seaman's death. I therefore decree, that the administrator take nothing by his libel. It is understood that no costs are claimed.